Market Cooperative. Good morning. I'd like to reserve two minutes of my time. May it please the court. I'm Patrick O'Hearn representing the appellants. I want to start by addressing the subject areas in this court's letter, the quick look analysis, market power, and the burden of proving pro-competitive benefits. The district court erred by not applying the quick look analysis. As the Supreme Court and this circuit have stated, quick look analysis is appropriate when the underlying conduct is facially anti-competitive. Here, the EMMC minimum pricing and policies and the AMC target prices are a classic example of horizontal price fixing. This is more than just horizontal here. We have some vertical aspects, so it seems like we're not in classic, you know, per se, bans or suspicion. It's hard to fit it into any of the existing pigeonholes, so it suggests that we should be in rule of reason territory. I mean, I know that my colleague here, Judge Jordan, had a similar opinion. Was that Toledo Mac, I think? Where, you know, rule of reason seems to apply when you have some horizontal, some vertical. It's not easy to call this just a straight horizontal price fixing. Fair enough. What Judge O'Neill did in this case was to indicate that because there were some vertical issues, vertical aspects of the price fixing, that the rule of reason should apply. Well, he said the per se should not apply, and therefore he went to rule of reason. But he also dropped a footnote and said, nobody's asked me about Quick Look. So the issue here is, as you know, is that the price fixing was amongst the growers who are horizontal competitors, but they were fixing the price at which they sold either on a vertically integrated basis or... They were attempting to fix the price perhaps, but the evidence seems to indicate they were singularly ineffective at it. There was lots of testimony that they might have been, they might have had a less than laudatory intention, but they were never able to put it into effect in a meaningful way. What's your response to that? Well, that is not what the contemporaneous documents said at all. This is all... That's what the testimony said, though, and this gets to your argument about the weight of the evidence, that this was against the great weight of the evidence. As I looked at the record, it seemed to me that there were repeated instances of testimony from many of the members or former members of this cooperative that just said, yeah, we couldn't do it. The competitive prices, you know, no matter what we said to each other, it's as if they all walked out of the room and said to themselves, yeah, we're all lying to each other because they couldn't make it stick. Why can't a jury hearing that kind of testimony say, yeah, they didn't have a... They may have told each other they had an agreement, but they didn't have an agreement, and if they did, they never abided by it. Well, they signed written agreements to be EMMC members, and that required them to comply with the EMMC current policies, which included in paragraph two... I'm not disagreeing with that. ...the minimum price. I'm not disagreeing with that, and I'm not being effective in trying to get you to answer this point, Mr. Ahern, which is about your weight of the evidence position. Correct. There is testimony, I think you'd have to concede this, from multiple sources saying we could not do... We could not... Yeah, we wrote yes on that paper, but we didn't do it. We couldn't do it. The competitive pressures in this commodity business were too extraordinary, and the perishable nature of this product just heightened that. We couldn't do it. So it doesn't matter what we wrote down. It's what actually happened that matters, and we couldn't do it. I take the pitch that the other side is making, and there is evidence to support it. Why isn't there enough evidence? Why couldn't a jury say, yeah, we believe that? It's not that you had nothing on your side. They just believe the other side. Why would we turn a verdict around on that basis? Well, because I don't believe that the evidence, as you go down the list of they discussed and agreed to the minimum prices, they intended to be bound by them, they did their best to do so, they did so most of the time. Several of the EMMC members testified that they charged the minimum prices most of the time. They raised their prices in order to comply with the EMMC minimum prices. This is all testimony at the trial. No question you have evidence on your side, and I didn't mean to imply you didn't. This goes to the issue of the extent of the injury and the damages. It doesn't go to the issue of impact. The issue of impact is whether the market was impacted, and Dr. Leffler said that it was and showed through the USDA data that it was. Dr. David said, I'm not saying that the market was not impacted. I'm not saying that the EMMC minimum prices did not increase mushroom prices. So this doesn't go to impact. In fact, Dr. David, their expert said, if you're impacted by more than zero, you're impacted. So the issue is whether or not there was impact on the market. I thought Dr. David testified based on the evidence that he had seen that this was not actually anti-competitive. Am I wrong about that? He did not testify that. And he did not testify that there was no anti-competitive impact. He testified when you make adjustments for inflation and the like, that prices were actually going down, not up. But he also testified that that didn't tell him whether or not the EMMC minimum prices had an effect on the market prices for mushrooms. Why don't you tell us what you thought he said? Well, he said that there was no market power, but that was based solely on his graph of declining market shares. And by definition, if you have no market power, particularly in a commodity market, you cannot control the market. You can't affect the price in a meaningful way, can you? If you've got no market power in a commodity market, how can you affect the price in a meaningful way? Well, I'll answer that in two ways. Number one, under Quick Look, market power is not necessary. We'll get back to Quick Look, but we're on. But as to market power, market power can be shown by a significant market share, and that's the Supreme Court in DuPont. I'm sorry, can you hold up just a moment? Do we have the clock not running? Oh, I do see, yeah, it was stuck on 13, I guess, I'm sorry. Yeah, it's as if it hadn't started. So I think it's fair to say we've been at this for at least five or six minutes. So you want to take that off the clock, and I think actually Mr. Ahering might get a little extra time. We'll give you a little more time anyway. Yeah, so take five minutes off the clock, and I think that still is fair. Do you feel fairly treated by that, Mr. Ahering? I do, Your Honor. Okay, good. I was all ready to talk about Quick Look, but that's okay. Yeah, we'll get to Quick Look. I interrupted you, I'm sorry, go ahead. No, no, so there's no dispute that the market share of the EMMC participants when they formed the EMMC and immediately embarked on the minimum prices was over 90% and stayed above 50% throughout the entire relevant time period. And certainly in 2004 was still above 70%. Under the Supreme Court decisions in DuPont, the Supreme Court held that market power may ordinarily be inferred from a predominant share of the relevant market. In American Tobacco, the Supreme Court held that predominant share of the market may suffice to demonstrate monopoly power. In Alcoa, the court held that the market share of 67% was sufficient to confer market power. And in all those cases, they had, well, the percentage numbers of the share of the market were a little puzzling to me because the argument was being made and made aggressively by EMMC that, yeah, collectively we represented that piece of the market, but we were all competing against each other in that set. It's not as if you had one company, a single entity claiming 60% of the market. You had a whole bunch of people who collectively had that part of the market, but they were, maybe just being repetitive, but their assertion is we weren't acting in a unified fashion. Far from it. We were competing with each other. So to say we collectively had X percentage of the market is kind of meaningless because we're not acting as a unified whole. We're back to that issue, aren't we? Well, Your Honor, that's not the way the Supreme Court and lower courts have defined what market power is. Well, how could it not be that? I mean, the point about saying we exercise market power is to say we collectively, we or I as a single entity am acting in a unified fashion and therefore I can influence the market. The evidence that's being argued to us is they weren't doing that. They were quite the contrary. They were competitive within their own ranks, so they were not representing 60% of the market moving in a specific direction. They were behaving in a competitive fashion. Well, if Your Honor wants to look at the totality in that sense, then I think you need to look at the market share. You need to look at the evidence regarding high barriers to entry, which Dr. David provided, and you also need to look at the context here. John Pia writes in 2001 or 2002 that the commitment is complete and total, and Charlie Matthews, the executive director, says the vast majority of the EMMC members are charging the EMMC prices. But that goes to the existence of competing evidence in the record, but don't we need to just be satisfied that the jury considered all of that and that a reasonable jury could conclude what they did? We have here, Judge O'Neill gave instructions under Weiss and Densley about the appropriate things to consider on market share, right? And those are factors that we assume the jury followed those instructions, considered what evidence there was in the record that went to those factors, and made its determination. How do you get over the very high hurdle to overturn that jury verdict? Well, with respect to the jury's finding, we believe that when the jury asked to see Dr. Leffler's chart, which is in the special appendix, that the jury was conflating impact on the market with injury to Winn-Dixie, and that was something that was... But that's an assumption, right? The chart only shows EMMC minimum prices and prices charged to Winn-Dixie. There's a different chart that shows impact on the market through the USDA prices. So, I mean, this is why, this is quite frankly why, in all due respect, this is a facially anti-competitive, whether it's horizontal or not. Well, let's get to that. Let's get to the quick issue that you've been wanting to get at. The first question I've got for you is, how is this an issue that can properly be put in front of a court in a motion in limine? You're asking, your assertion was, hey, this is the mode of analysis which should determine this entire case. I'm just a little mystified by that. I always understood a motion in limine to be a way that a person brought to the court at the very end of the case, just as you're getting ready to go into trial, look, judge, we expect them to offer this thing in evidence. Please don't let that happen. It's unduly prejudicial, or something of that nature. It is, you know, may have a little bit of fancy Latin in it, but it's a way of saying, please limit this particular piece of evidence by an instruction. We're not letting it in at all. This is an ask that certainly feels like it's a motion for partial summary judgment. It's a statement, this should govern the entire analytical structure of this suit. How is this a motion in limine? Well, your honor, I mean, there have been circumstances in cases where the issue of the legal standard before the trial is raised in a motion in limine. And, you know, here we had a situation where initially Judge O'Neill, you know, handed the case off to Judge Schiller, but Judge O'Neill had ruled that there was rule of reason, but left open the quick look, the possibility of quick look. Well, he may have left it open. I'm not trying to be nitpicky here. It just is, I don't, I don't, it seems profoundly odd to me to say, to find fault with the district court on the eve of trial, giving you what is, what amounts to a footnote of analysis in response to one of multiple motions in limine. And saying, that's the thing. That's the, that's that analytical construct that sinks this whole case. But, well, I mean, the district court did not raise that as its reason for denying the motion, the motion in limine with respect to quick look. The district court. I recognize that, but I wonder if that ought not be, should that be in our minds as we're thinking, I mean, how can, how can it, how can it be that something this dramatic can be raised at the last minute, and then the district court judge be faulted for, you know, not giving it the fulsome analysis that the plaintiff thinks it should have gotten? Well, it wasn't that he didn't give it the fulsome analysis. It's what, it's that he gave the wrong analysis, because he said it's not anti-competitive on its face because of the, but because of the effects. He didn't just say that, right? He said that, which I understand you find fault with. But he also said that this is a conspiracy that involves, quote, a complex relationship among numerous parties with varying market roles, close quote, and so quick look analysis would be inappropriate. I think that's what Judge Bibas was asking you right out of the box. This is, this isn't the ordinary quick look kind of world where you got one competitor with a significant large market share doing stuff. This is an accumulation of people with all kinds of intersecting and often, very often conflicting roles, and that just isn't what quick look is for. Why is that a legally erroneous conclusion? Well, the first sentence of that paragraph says, the court finds the quick look analysis is not appropriate here because the effects of the minimum pricing policy are not, quote, obvious or facially anti-competitive, close quote. I agree with you that the judge also said that, but he said the part I'm giving you too, which seems to me to be a separate and independent reason for saying quick look doesn't fit. Well, and he cites Food Lion though, but Food Lion was not a price-fixing case. This is at some level a price-fixing case. And the only reason it's not per se is because of the fact that they decided to fix the price of, I mean, let's be really clear about this. You had these competitors and they fixed the price not at the price that they sold it to, unless they were vertically integrated like Monterey or some others, but also the price at which their affiliated distributors sold to. So this is, it is a horizontal price-fixing conspiracy in sheep's clothing with the vertical elements. All right. Thanks, Mr. Ahern. We'll have you back for two minutes on rebuttal, and we'll hear from your colleagues on the other side. Good morning. William DeStefano with Saxon & Stumpf, arguing on behalf of the Appalese. I would like to, to the extent the court has questions with respect to my learned counsel's last argument, the attorney misconduct argument, which is so labeled, to defer to my colleague, Ms. Pavelsky, because I am the person who allegedly committed the misconduct. But I don't think we'll. If you have no questions or do not want to hear argument on that last argument, then it's a. I don't expect we'll be getting into that, but if we do, you'll stop us and we'll do what we need to do. OK, but go ahead with your argument, please. Thank you. Let me first start with a quick look at a couple of observations. It's our contention that Judge Schiller or the district court was absolutely correct in his analysis, albeit in a footnote, that the quick look should not apply. Now, would you agree that it was erroneous to for the court to say that a quick look is inappropriate, because it's not this was this minimum pricing policy was not obviously or facially anti-competitive? No, because you have to look at the minimum pricing policy, which Judge O'Neill did in the opinion that Judge Schiller cited. It's not the mere signing of a membership agreement. The membership agreement simply says you have to abide by the bylaws of the of the agricultural co-op. And the bylaws enable the executive committee of the co-op to promulgate reasonable rules and regulations for the marketing of mushrooms. So when you look and you can look at the very first question on the verdict for the conspiracy is described as the promulgation and adherence to rules and regulations, which collectively call themselves the minimum pricing policy of the AMC. Well, go ahead and so you can't talk over. Lots of people want to do that, and I can understand why. But you got to let me get my question out. Sure, please. If you think that's correct, that that piece of what the district court said address our decision in the United States versus Brown University, where we said that an agreement that aims to restrain competitive bidding and deprive prospective students of the ability to utilize and compare prices and selecting among schools is anti competitive on its face. Yes, but again, I will go back to the minimum pricing policy, which the evidence of both pretrial and at trial contained a major exception that pretty much swallowed up the rule. The exception was if a competitor comes up with a with a lower price than the the group or the group members are unable to to disregard the minimum policy. Minimum price wasn't it clear? I mean, I don't even think people that was a part of the minimum price. I don't even think people were disagreeing, Mr. Stefano, that the effort here was to agree to minimum prices and raise the prices. And that Mr. Pia got in there and said, we've done it. We've done. Hallelujah. We've done it. Yes, my only point, Judge Jordan, is that is that when you look at the contours of the minimum pricing policy properly. It is not obviously and facially anti competitive because of this exception and because of the nature of the product. But we can move on from there because as as you correctly point out, there was there was not one, but several other reasons why Judge Schiller decided to to reject the quick look doctrine in this case. The most prominent being cases cited in Judge O'Neill's opinion way back in 2015, which was which was a year after southeastern milk was decided. He cites three cases with approval and quoting for the proposition American Airlines case, the Major League Baseball case and another case, which is escaping my process eggs. I'm sorry. And Harris versus Safeway. Those cases all stand for the proposition that where a where the proofs depend largely on expert testimony. It does a quantitative analysis of of of of of the market and what happened here. Quick look is just plainly not appropriate. So, for example, can you can you take head on the argument that it's the market share numbers are undisputed here and they start out like around 90 percent? They go down over time, but they still are dramatically large. They start dramatically large because what the what was being measured there was the the percentage of United States production. Canadian production, Mexican production, which was very influential and were not counted in those market shares. I think the testimony was Canadian growers highly influenced. They weren't part of the MNC and and they they were able to distribute their product. One witness testified throughout the United States. The same thing with the southeastern or southwestern part of the country with with Mexican growers. So the market share numbers are a bit funky because they're not they're not including foreign competition. And we're not talking about competition from China. We're talking about competition from many growers in the southern areas of Canada. Because this is fresh mushrooms we're talking about. Correct. Correct. And we understand and everybody understood that fresh mushrooms have a very limited area of distribution. Interestingly, plaintiff's expert offered a net opinion defining the relevant market, the relevant geographic market here as the entire non-western United States. But then later said that he thinks that that the relevant market is something that's confined to a thousand miles from where these mushrooms are produced. In an earlier thing, in an earlier case, a related case, he issued a report basically saying the area of distribution is really somewhere between 500 and 800 miles. So there was a lot of inconsistency in the plaintiff's expert geographic market definition. The defendants claimed it was it was it was a much smaller area, more like 500 to 800 miles. But significantly. I don't want to I don't want to lose the chance to have you talk about this. Can you explain how we end up arguing about whether quick look or the rule of reason applies at the motion eliminate stage of the case? It's not a motion. It was styled a motion. It's more akin to a motion for partial summary judgment. When the issue was first brought up before Judge O'Neill in 2015, it was by virtue of a motion for partial summary judgment. Judge O'Neill made the opinion. Call something something, but it doesn't matter. We have to look behind what you call it to assess the true nature of it. For example, I think he said plaintiffs characterize this continuously as a horizontal conspiracy, but that doesn't make it so. So. So it's addressed. Yeah. Go ahead and take it. Take it. Proceed. Procedurally. How do we get from that ruling on a motion for partial summary judgment and then end up arguing about this on the eve of trial characterized as a motion eliminate? Simply, simply the no party objected to the timeliness of of of the motion. It was within the time period of of motions eliminate because judge you've just aptly noted. It's not a motion eliminate. Right. But but but it wasn't objected to and it wasn't ruled on and it was ruled out. I mean, it was not there was no objection that was ruled on because there was no objection. Right. Fine. Anyway, going back to two. Essentially, I guess we're coming down to was Judge Schiller was the district court correct in declining pretrial declining plaintiffs application for application of the quick look doctrine? We say he was correct for the reason you mentioned. This is a complicated alleged conspiracy between persons at different level, but also because that the proofs depended on expert testimony and and. Yeah. Can you describe characterized Dr. David's testimony for Dr. David? You know, we've got it in the record, but but Mr. Ernest been quick to point out to say he never said it wasn't anti-competitive. He never said they didn't affect the market like he didn't. He didn't. What did he say that helped you? What he said that helped us was was that they did not have market power. Market power is defined and was defined to this jury as the ability to impose a significant price increase on the marketplace that lasts for a sustained for a period of time. That's the definition of market power. Judge Judge Dr. David simply simply said that you have a share of production that is quite high. The evidence shows that it was never it was never followed. There was competition, foreign competition from Canada and competition from other growers in the United States who didn't join the EMC. And there was intra competition between the members of the EMC that pretty much pretty much obliterated or eviscerated the minimum pricing policy. He also he also testified that that market share and this is correct is not to be all and end all. It's one of several factors that the jury was instructed. They should take into consideration. I have the antitrust model jury instructions. That's all right. And and and Judge Schiller correctly, without objection, charged the jury that they would be they would consider whether or not these defendants had the ability to impose a significant price increase on the marketplace. Marketplace being the entire eastern United States. And they simply didn't. OK. He did. Thank you. Thank you. Now, am I correct that Mr. Gallow would like to have two minutes? Sure. Thanks. Thank you. May it please the court. Patrick Gallo appearing on behalf of the Pele defendant, United Mushroom Farms Cooperative Inc. With the court's permission, I would like to focus on the threshold issue of participation. Here, Winn-Dixie was required to prove that each defendant participated in the conspiracy. As the court knows, after a 14 day trial, the jury unanimously found that with the exception of the EMC, EMMC, excuse me, itself, none of the defendants or members that appeared on the verdict slip participated in any conspiracy. And within its briefing, Winn-Dixie concedes that there was sufficient evidence that United Mushroom did not participate in any conspiracy. I don't believe United was even mentioned within Winn-Dixie's principle brief. The record below before the court reflects that United was a local Spanish-speaking group of local Spanish-speaking mushroom growers and merely a passive member of the EMMC. I know there's been some argument about signed membership agreements. There's no evidence that United ever signed a membership agreement. United had no role in the formation of the EMMC. United had no role with respect to the formation of any of the minimum pricing policies. Did not even know what the minimum pricing policies were. And there's no evidence they ever had a copy of the minimum price list. The record also reflected that United never used the minimum price list, never sold its mushrooms to retailers or food service providers. And this all goes into the various nature of the different roles. You have growers, you have vertically integrated distribution operations. The minimum pricing list didn't even apply to a pure grower such as United. And United never negotiated any of its prices with Packers to its sold. All of its sales were below the minimum price list. So it's respectfully submitted to the court, Your Honor, that United and the EMMC and the other members did not participate in any conspiracy with George Fountain. And the inquiry stops there. Okay. Thanks, Mr. Cowley. Thank you, Your Honor. Mr. Ahern. Yes. To talk specifically about Dr. David's testimony, just to be clear about this, he testified he was not offering an opinion that the EMMC minimum prices and the AMC target prices did not increase the price of fresh mushrooms in the market. He also said he admitted that inflation-adjusted mushroom prices, the fact that they may have gone down, would not tell him whether there was a super competitive prices charged by the EMMC minimum prices and AMC target prices. And that's, of course, true because you can have a price-fixing agreement to stabilize or even slow the decline. Right. He was saying he wasn't offering an opinion trying to sort out what the different influences on the price may have been, right? Well, I mean, he obviously… He didn't concede what your expert was saying. He just said, I'm not getting into that. I'm not rendering an opinion on how the various influences on price might have worked out here. Well, it's a little bit more than that, though, because on the first point, yes. But on the second point, the fact that the inflation-adjusted mushroom prices may have gone down, he's specifically saying that that cannot be considered in determining impact because it doesn't tell you whether or not there was impact. Thank you. I think we're actually saying the same thing, which is he's just saying, I don't know. Well, I'm drawing a little bit of a distinction. And I'm not trying to tell you I know. But he also testified that there was some compliance with the minimum prices that worked and that the conspiracy did have an impact. He said, you know, to an economist, if you're impacted by more than zero, you're impacted. Very briefly, professional engineers in Indiana dentists really control this case. And the conduct here is more blatantly anti-competitive. Are they quick look cases? They are. Yeah. And the Supreme Court in California Dental said these were the first two quick look cases. And those cases, the conduct here is more blatantly anti-competitive than the conduct in those cases. In professional engineers, it was, you know, we can't talk to customers about price or stuff like that. You know the cases. Yeah. And we have your argument. Right. And then finally, there was absolutely no evidence of any pro-competitive benefits. Okay. Thank you very much. Thank you very much. And thanks to all counsel for your arguments. We'll take the matter under advisement.